HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RUSSELL CHILDS,

    Plaintiff,

v.

MICROSOFT CORPORATION,

    Defendant.

CASE NO. C10-1916RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendant's motion for summary judgment (Dkt. # 55) and Plaintiff's motion to compel (Dkt. # 60). The Plaintiff requested oral argument on both motions; the Defendant did not. The court finds the motions suitable for disposition on the basis of the parties' briefing and supporting evidence. For the reasons explained below, the court GRANTS the Defendant's motion (Dkt. # 55) and DENIES the Plaintiff's motion (Dkt. # 60).

## II. BACKGROUND

Plaintiff Russell Childs was employed by Defendant Microsoft Corporation ("Microsoft") in 2008 and 2009 as a software developer. Dr. Childs is a U.K. citizen, and thus when Microsoft recruited him in February 2008 in Canada, Microsoft applied for an H-1B visa for Dr. Childs to allow him to work in the United States. *See* Harris Decl.

ORDER – 1

(Dkt. # 56) ¶ 7. Beginning in May 2008, Dr. Childs worked in the Microsoft Canada office. According to Microsoft, Dr. Childs was told before he was hired that, as a condition of employment in his position, he would need to relocate to Redmond, Washington. *See* Harris Decl. ¶ 7. According to Dr. Childs, Microsoft promised him a permanent job in Canada, and also promised legal representation to assist Dr. Childs in obtaining expedited permanent residency status in Canada. *See* Childs Decl. (Dkt. # 70) ¶¶ 4, 6.[1] Dr. Childs also alleges that Microsoft promised other benefits that it failed to provide. *See* Childs Decl. (Dkt. # 70) ¶¶ 7-9. According to Dr. Childs, he reluctantly agreed to relocate to Redmond, relying on Microsoft's promised benefits. *See* Childs Decl. (Dkt. # 70) ¶ 13.

Between the time Dr. Childs started work in May 2008 and when he relocated to Redmond on November 3, 2008, he worked remotely from British Columbia. *See* Harris Decl. (Dkt. # 56) ¶ 5. Remote employment proved to be problematic; there is evidence in the record that Dr. Childs was less productive while working remotely and that a lack of technical infrastructure made it difficult to perform necessary job functions. *See* Joy Decl. (Dkt. # 57) ¶ 2. In May 2008, Dr. Childs intended to apply for permanent residency in Canada, and asked Microsoft to complete a Guaranteed Job Offer form, which would have required a Microsoft representative to certify that Dr. Childs was employed in a permanent position in Canada for indefinite duration. *See* Harris Decl. (Dkt. # 56) ¶ 9. Because Microsoft intended that Dr. Childs relocate to Redmond, Dr. Childs' supervisors declined to sign the form. *See id.*, Ex. 3.

Dr. Childs' H-1B U.S. work authorization was approved to begin in October 2008, but in September, Dr. Childs told his supervisors that he wished to remain in Canada. *See* Harris Decl. (Dkt. # 56) ¶ 8, Ex. 2. Dr. Childs was informed, however, that his

---

[1] According to Microsoft, Dr. Childs was told that Microsoft would support his efforts to obtain permanent-resident status in Canada only if it did not conflict with his relocation to the Redmond. *See* Joy Decl. (Dkt. # 57) ¶ 3.

ORDER – 2

current position required relocation to Redmond by October 1, 2008, and if he wished to remain in Canada, he would need to seek internal transfer to a Microsoft position located in Canada. *See id*. Dr. Childs did not seek internal transfer, and instead made plans to relocate to Redmond.

In contemplation of Dr. Childs' relocation to Redmond, Dr. Childs was presented with an employment agreement and asked to sign it before his Redmond start date. *See* Heu-Weller Decl. (Dkt. # 58), Ex. K (Microsoft's job offer letter, instructing "Please indicate your acceptance of this offer by electronically signing and submitting this acceptance letter and the Microsoft Corporation Employee Agreement . . . . It is important that we receive your letter and the signed Employee Agreement prior to your start date."). Dr. Childs accepted the job offer of Redmond employment, but refused to sign the Employment Agreement due to a dispute over a section addressing employees' intellectual property rights. Dr. Childs disputed whether certain intellectual property was exempt from the Agreement, and accordingly refused to sign the Agreement until February 9, 2009. During the period that Dr. Childs was working in Redmond but had not signed the Employment Agreement, Dr. Childs was paid through the Microsoft Canada office in Canadian dollars. In the course of an e-mail string regarding Agreement negotiations, Dr. Childs told a Microsoft human resources employee on January 26, 2009, that he was frustrated to the point of informing federal authorities about Microsoft's immigration violations. *See* McDermott Decl. (Dkt. # 73), Ex. 28.

For much of February 2009, Dr. Childs worked from home. On February 23, 2009, Dr. Childs' supervisor Navin Joy e-mailed Dr. Childs, informing him that working from home for such an extended period of time was unacceptable and that Dr. Childs was thereafter expected to come to work every day. *See* Joy Decl. (Dkt. # 57), Ex. 3. In March 2009, Mr. Joy undertook a midyear performance evaluation of Dr. Childs, rating his performance in four areas: deliverables, life site quality, engineering excellence, and

ORDER – 3

personal growth. Mr. Joy found that Dr. Childs had underperformed in each category. *See* Joy Decl. (Dkt. # 57), Ex. 4.

Dr. Childs disputed Mr. Joy's assessment of his performance, and he filed a formal grievance in response in late March 2009. *See* Heu-Weller Decl. (Dkt. # 58). A few months later, in August 2009, Mr. Joy conducted an annual assessment of Dr. Childs, and concluded that he had again underperformed in all four evaluation categories. *See* Heu-Weller (Dkt. # 58), Ex. F. The same day that Dr. Childs received a copy of his annual evaluation, Microsoft terminated his employment.

Dr. Childs filed this lawsuit in King County Superior Court in October 2010, and it was removed to this court the following month. Microsoft has filed a motion for summary judgment on all remaining causes of action, and the court now turns to consider that motion.

### III. ANALYSIS

**A. Legal Standards.**

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

ORDER – 4

**B.      Plaintiff's Claim for Violation of Washington's Minimum Wage Act Fails.**

Dr. Childs contends that because Microsoft delayed initiating his U.S. salary after he relocated to Redmond, Microsoft violated Washington's Minimum Wage Act ("MWA"), RCW 49.46.090.  Microsoft argues that this issue was already resolved via a U.S. Department of Labor ("DOL") proceeding: Dr. Childs filed a DOL complaint in January 2010, alleging that Microsoft had failed to pay him all wages owed during the period where he was working at Redmond but had not signed the employment agreement. The administrative law judge resolved Dr. Childs' complaint, finding that Dr. Childs had been paid all wages owed and that Microsoft owed only pre-judgment interest on the delayed wages.  *See* Chen Decl. (Dkt. # 41), Ex. 1.  Thus, according to Microsoft, Dr. Childs is not currently owed any wages from Microsoft, and the MWA claim fails under a *res judicata* theory.

The court agrees with Microsoft.  Dr. Childs has already fully litigated his wage claim, and the administrative law judge's order already resolved the wage-related issues presented in this lawsuit.  Dr. Childs' Opposition does not address *res judicata* or identify any wage issues that were not addressed by the DOL administrative law judge.  To whatever degree Dr. Childs attempts to contend that he was an "hourly" employee and thus Microsoft's delayed payments were insufficient because they did not include overtime, this argument is contradicted by Dr. Childs' acceptance of the Redmond job as an exempt employee.  *See* Moore Dec. (Dkt. # 9), Ex. 2.  The employment agreement Dr. Childs eventually signed did not address compensation.  *See id.*  Thus, the undisputed evidence shows that Dr. Childs was an exempt employee, not entitled to overtime.  As such, Dr. Childs cannot invoke the MWA to seek overtime pay, nor does the MWA

ORDER – 5

provide a basis for Dr. Childs' request for payment for any other benefits listed in his Opposition (Dkt. # 68), at 13. Thus, Dr. Childs' MWA claim fails as a matter of law.[2]

**C.     Plaintiff's Claim for Wrongful Discharge in Violation of Public Policy Fails.**

According to Dr. Childs, his termination violated public policy because it constitutes retaliation for his threat to report Microsoft's wage violations. Microsoft argues that this claim must fail because, *inter alia*, Dr. Childs has not shown the existence of a public policy protecting his right to raise a wage claim. *See Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 178 (2005) (listing the elements of a wrongful discharge claim, one of which is "the existence of a clear public policy"). The court agrees with Microsoft.

In Washington, a claim for wrongful termination in violation of public policy requires a plaintiff to identify "a stated public policy, either legislatively or judicially recognized," that was violated. *Bennett v. Hardy*, 113 Wn.2d 912, 924 (1990). Dr. Childs cites RCW 49.60.210 as a statement of public policy, and that section provides that "[i]t is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter[.]" But "this chapter" refers to RCW 49.60, which prohibits discrimination on the basis of race, gender, sex, disability, national origin and other bases, but not non-payment of wages or another unfair labor practice.[3] Thus, the court agrees with

---

[2] Dr. Childs requested that, if the court finds the MWA claim to be deficient, he be permitted to amend his Complaint to assert a claim under Washington's Wage Rebate Act for Microsoft's withholding of pay and benefits. It is unclear why Dr. Childs assumes that a Wage Rebate Act claim for withholding wages would fare any better than a MWA claim for withholding wages. Though Dr. Childs contends that "[e]ither way, it should go to the jury on the dispute over what is owed, particularly in overtime," the court has already explained that Dr. Childs was an exempt employee and not entitled to overtime, and finds that the DOL administrative law judge has already ruled on "the dispute over what is owed." Thus, the court finds that Dr. Childs is not entitled to leave to amend.

[3] Dr. Childs tries to recharacterize his wrongful discharge claim as based on national-origin discrimination rather than retaliation for opposing an unfair labor practice. *See* Pltf.'s Opp'n at 15:14-20. But to whatever degree Dr. Childs contends that he was discharged as a

ORDER – 6

Microsoft that Dr. Childs has failed to identify a relevant public policy for purposes of his wrongful discharge claim, and his claim therefore fails.

## D. Plaintiff's National-Origin Employment Discrimination Claims Fail.[4]

Dr. Childs alleges that Microsoft engaged in employment discrimination on the basis of national origin when it required that he relocate to the United States and sign an employment agreement without alteration. According to Dr. Childs, Microsoft's policies discriminated against foreign workers: "Even if such protocols were facially neutral as to all, and even if other employees wanted to leave Canada and come to the U.S., most are not in a position to object. . . . [F]oreign workers as a protected class are undeniably affected by such practices, even if many are reluctant to raise an objection." Pltf.'s Opp'n at 20-21.

Dr. Childs' allegations attempt to equate "national origin" with citizenship status, however, because the only people that would be affected by the policies complained of by Dr. Childs would be non-citizens, regardless of their national origin: if Dr. Childs had refused to sign Microsoft's employment agreement, thereby refusing the job offer, he would be no longer eligible to work in the United States and would therefore have to be repatriated. But repatriation occurred as a result of Dr. Childs' status as a non-citizen of the United States, not as a result of his national origin. The United States Supreme Court has made clear that Title VII does not prohibit discrimination based on citizenship, and

---

result of national-origin discrimination, that discrimination is enveloped into his employment discrimination claim. Maintaining such a claim for wrongful discharge would thus be duplicative.

[4] Though Dr. Childs' Complaint also lists race and disparate-impact discrimination claims, and Microsoft sought summary judgment against those claims, Dr. Childs' Opposition does not address those claims and instead focuses on national-origin discrimination. Though Dr. Childs' Opposition includes a "disparate treatment" heading on page 20, the subsequent section focuses entirely on Title VII national origin discrimination and not on the elements of a disparate-impact claim. Because it appears that Dr. Childs has abandoned his race and disparate-impact discrimination claims and does not oppose summary judgment against them, the court will not further address those claims.

ORDER – 7

held explicitly that a citizenship requirement does not constitute "national origin" discrimination. *See Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88-89 (1973).

Though Dr. Childs contends that he appreciates the difference between national origin and citizenship, and that his discrimination claims are based on national origin discrimination, his allegations and arguments do not support such a contention. Dr. Childs is not contending that he was adversely affected by Microsoft's relocation policies because of his national origin; he did not face repatriation due to his national origin, but based on his immigration status. The distinguishing characteristic of Dr. Childs' purported "protected class" is therefore immigration status, and that characteristic is not protected by Title VII or Washington's Law Against Discrimination, RCW 49.60.180(3).

**E.     Plaintiff's Misrepresentation Claim Fails.**

Dr. Childs has identified one specific promise that he alleges Microsoft employees made to him when he was hired in Canada: that Microsoft would assist him with legal representation to obtain expedited permanent residency status in Canada. According to Dr. Childs, this promise was broken because when Dr. Childs attempted to file for permanent residency in Canada, Microsoft refused to complete one of the required forms, a "guaranteed job offer." According to Dr. Childs, he relied on that promise when he originally decided to accept the job offer in February 2008.

There are six elements of a negligent misrepresentation claim in Washington: (1) the defendant supplies false information that guide the plaintiff's business transaction, (2) the defendant knew or should have known that the information was offered to advise a plaintiff's business transaction, (3) the defendant obtained or communicated the false information negligently, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff's damages. *See Ross v. Kirner*, 162 Wn.2d 493, 499 (2007). Microsoft contends that Dr. Childs cannot meet his burden on the first and fifth elements.

ORDER – 8

With regard to the fifth element, Dr. Childs' reliance, Microsoft contends that any "reliance" by Dr. Childs on a promise of expedited permanent residency in Canada was unreasonable in light of his authorization before he started working for Microsoft in Canada that Microsoft pursue an H-1B visa on his behalf to allow him to work in the United States. *See* Heu-Weller Decl. (Dkt. # 58), Ex. B. On March 6, 2008, a Microsoft employee, Andy Gottlieb, wrote to Dr. Childs regarding immigration issues, recognizing that it was unclear at that point whether Dr. Childs would work in Canada or would relocate to Redmond. *Id*. Mr. Gottlieb wrote Dr. Childs, in pertinent part:

> I know you may not have received your offer, much less accepted it yet, but in advance of this hopeful occurrence, I'd like to ask you a quick question regarding possible visa procedures.
>
> We had talked about a possible Microsoft Canada Development Center placement for you, since you're not eligible for a TN visa; however, would you be interested in Redmond in Oct. 08 if we got an H1-b visa approved for you? If so, we'll go ahead and apply for your H1-b for you. You'd still start in Vancouver as soon as we could get you there.
>
> The H1-b deadline is Apr. 1, and so I'm asking you now since we're close to the deadline and we want you to have plenty of time to get the paper work together.
>
> It's ok if you want to stay and work at the [Microsoft Canada Development Center]; in any case, in about a year you'd be eligible for the L1 visa to Redmond.
>
> . . .
>
> Let me know your thoughts! None of this affects your offer at all, simply how future locations might work, and when. If we want to file for your H1-b, I want to be in plenty of time.

Heu-Weller Decl (Dkt. # 58), Ex. B. Dr. Childs wrote back later that same day:

> I think the H-1B option is perfectly okay, but it may be prudent for me to aim for landed immigration status in Canada before returning to the US, given the long and grueling path to permanent residency.

ORDER – 9

> I may be mistaken, but I think it's a reasonably fast process acquiring landed immigrant status in Canada. I'd hate to pass up the opportunity to become a permanent resident on both sides of the border.
>
> I'll pop into the immigration office and find out what my options are. But in the meantime, I think you are probably right that we should aim for an H-1B whilst they remain available.

*Id.* According to Microsoft, because Dr. Childs authorized Microsoft to apply for an H-1B visa for him before he formally accepted a job offer with Microsoft, he acquiesced to working in the United States in October 2008 and could not have reasonably relied on any promise of expedited Canadian permanent residency when he decided to accept the job. Furthermore, there is another e-mail string from late May 2008 showing that Dr. Childs understood that his H-1B visa application was mutually exclusive from permanent residency in Canada. Mr. Joy wrote to Dr. Childs about his immigration preferences:

> From our chat yesterday, it appears that you'd prefer to come to the US on an H1-B via as opposed to an L-1 correct? I'm going to ask the legal folks to go ahead with their applications.
> Let me know ASAP if this isn't how you'd like to proceed.

Joy Decl. (Dkt. # 57), Ex. 2. Three days later, Dr. Childs responded:

> I think the default was L1, mainly because of the difficulties with H-1B quotas. I suggested to legal that the H-1B option would cover all bases. As far as I am aware, I have got past the lottery stage, but I am uncertain regarding whether this means I am going to get the H-1B.
>
> Could you also persuade legal to provide some assistance with landed immigrant status? I don't want a great deal, just whatever the company needs to do for me to satisfy the British Columbia Provincial Nominee Programme requirements. It takes about 1 year to get permanent status under the PNP, but 3 years otherwise. I would like to be as mobile as possible, so that [Microsoft] can post me wherever I need to go, without the headache of visas. I'm especially worried about the length of time and the pitfalls associated with getting a Green Card, so I would feel a lot more relaxed knowing that I can continue to work for [Microsoft] at [Microsoft

ORDER – 10

> Canada Development Center], without restriction, if my H-1B expires but I have no Green Card.

*Id.* The next day, Mr. Joy responded with clarification:

> I talked this over with [Ed Harris] and the legal folks. We do apply for permanent residency for people working long term in Canada. However in your case, there is no business justification for pursuing a Canadian work permit, as the plan of record is for you [to] join the Redmond team as soon as possible. It's really up to you whether you choose to go the H-1B route or L-1 route for this, although we'd certainly like to have you in Redmond sooner rather than later.
>
> Microsoft does a great job of applying for the US permanent residency, particularly now that you have been pre-selected in the lottery (this is the hard part). We do this for thousands of people every year and have a near-perfect track record. In any case, Ed assures me that we will expedite your green card process in any way possible and that we can include your advanced degrees in the application – this will reduce the risk of the green-card process not completing before your visa expires.

*Id.*

Microsoft argues, and the court agrees, that these e-mails show that Dr. Childs authorized Microsoft to apply for an H-1B visa on his behalf, for the purpose of allowing him to work in the United States in the fall of 2008. Dr. Childs' acquiescence to Microsoft's seeking approval for him to work in the United States, a move that is inconsistent with permanent residency in Canada, undercuts his allegation of reasonable reliance.

The crux of Dr. Childs' claim seems to be that he believed he could receive an H-1B visa to work in the United States and then relocate to the United States, while simultaneously applying for permanent residency in Canada. But Dr. Childs has not shown that Microsoft represented that it would (or could) assist him in achieving these mutually exclusive goals. Applying for permanent residency in Canada would require Microsoft to certify that it had hired Dr. Childs for a permanent job located in Canada, for

ORDER – 11

the indefinite future, and Microsoft could not certify to those facts because it had hired Dr. Childs with the intention of him relocating to Redmond. *See* Joy Decl. ¶ 3. Once Dr. Childs became aware that working in the United States was going to be an obstacle to obtaining permanent residency in Canada, he attempted to obtain an extension at the MCDC so that he could reside in Canada long enough to satisfy Canadian residency requirements. *See* Harris Decl. (Dkt. # 56), Ex. 2. Mr. Harris informed Dr. Childs that if he wished to remain in his current position, he would need to relocate to Redmond as soon as his H-1B visa was approved, and that Microsoft supported Dr. Childs' pursuit of Canadian permanent residency only during the window of time when he was at the MCDC awaiting U.S. work authorization. And once Dr. Childs' visa was approved, Microsoft expected him to relocate to Redmond unless he sought an internal transfer to a Canadian position. Dr. Childs did not seek such a transfer.

These undisputed facts establish that (assuming without finding that Microsoft did promise to assist Dr. Childs with obtaining expedited Canadian permanent residency) to whatever degree Dr. Childs was thwarted in obtaining Canadian permanent residency, he was thwarted as a result of his own acquiescence to Microsoft's H-1B visa application on his behalf and his subsequent relocation to Redmond, as required by his job. There is no evidence showing that if Dr. Childs had applied for and received an internal transfer and remained in Canada, Microsoft would not have assisted him in obtaining permanent residency in Canada. Thus, the court finds that Dr. Childs has not shown that Microsoft's representations were false,[5] and that to whatever degree he relied on its representations, it

---

[5] Microsoft argues in the alternative that Dr. Childs cannot establish that any representations were false because they were promises about future conduct, not present conduct, and thus could not be false at the time they were represented. *See* Defs.' Mot. at 16. Dr. Childs cites *Flower v. T.R.A. Industries, Inc.*, 127 Wn. App.13 (2005), for the proposition that a promise made about future conduct can support a misrepresentation claim if the promisor makes the promise with no intention of ever performing that promise. *Flower* proves to be irrelevant to the court's analysis of the misrepresentation claim, however, because the court's analysis is not grounded on the future nature of the promises as the basis for concluding that Dr. Childs' misrepresentation claim fails. As stated in this section, the undisputed evidence shows that

ORDER – 12

was not reasonable to rely on promises of legal assistance toward one goal (Canadian permanent residency) while simultaneously authorizing steps toward a mutually exclusive goal (working in the United States). For these reasons, the court finds that Dr.Childs' misrepresentation claim fails as a matter of law.

**F.     Plaintiff has Abandoned his "Catch-all" Claim for Violation of Federal Laws.**

In its summary judgment motion, Microsoft addressed Dr. Childs' claim for violations of "federal law," outlining why the claims based on 8 U.S.C. § 1201, 20 C.F.R. § 655.731-32, 20 C.F.R. § 655.739, and 20 C.F.R. § 655.801 fail as a matter of law for various reasons. Dr. Childs' Opposition does not address those claims, nor does he rebut any of Microsoft's arguments. The court considers those claims to be abandoned, and thus will grant Microsoft's motion as to those claims.

**G.     Plaintiff's Motion to Compel is Denied.**

After the discovery cutoff in this case had passed, Dr. Childs filed a motion to compel missing e-mail from his Microsoft account related to his work, history, status and termination.[6] Microsoft did not preserve Dr. Childs' e-mail account after he was terminated, and Microsoft contends that it followed its standard protocol regarding retention of documents after termination. Microsoft nonetheless searched its electronically stored data to recover thousands of pages of documents, after Dr. Childs identified particular correspondents that he was particularly focused on. *See* Def.'s Opp'n (Dkt. # 78) at 4-5. Dr. Childs maintains that destruction of his e-mail account amounts to spoliation of evidence potentially relevant to the litigation, and requests sanctions. As a potential sanction, Dr. Childs proposes excluding argument that "Dr.

---

Microsoft did not misrepresent its willingness to assist Dr. Childs in obtaining permanent residency in Canada, so long as it did not interfere with his ability to work in Redmond as originally intended.

[6] Dr. Childs also moved to compel discovery related to a Rule 30(b)(6) deposition, but has since withdrawn that portion of the motion. *See* Reply (Dkt. # 87) at 1.

ORDER – 13

Childs['] work was inadequate and that he underperformed." Pltf.'s Reply (Dkt. # 87) at 6.

As demonstrated by the court's analysis in previous sections, none of the analysis rests on an evaluation of Microsoft's assertion that Dr. Childs' work was inadequate or that he underperformed. Thus, e-mails that may show that Dr. Childs contributed to major projects, or that particular co-workers benefited from his collaboration, would not be relevant to this lawsuit and the court therefore has no basis to compel Microsoft to produce them and does not find that spoliation sanctions are appropriate. Thus, even if the court were to grant Dr. Childs' request for sanctions in the form of preventing Microsoft from asserting that his work was inadequate, such an exclusion would not affect the court's evaluation of the claims in this case. Thus, the court will deny Dr. Childs' untimely motion to compel.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS Defendant's motion (Dkt. # 55), and DENIES Plaintiff's motion (Dkt. # 60).

DATED this 16th day of December, 2011.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge

ORDER – 14